**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **ERIC MAYSHACK, ERICA MAYSHACK AND ARIEL LEE**<br><br>**v.**<br><br>**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, WILBER AND ASSOCIATES, P.C. d/b/a WILBER GROUP and T.L. THOMPSON & ASSOCIATES, INC.** | Case No.: 5:25-CV-01587<br><br>Judge: S. Maurice Hicks, Jr.<br><br>Magistrate Judge: Mark L. Hornsby<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Ariel Lee, Eric Mayshack, and Erica Mayshack (collectively "Plaintiffs"), who, individually and on behalf of themselves and a class of individuals similarly situated, file this First Amended Class Action Complaint against Defendants State Farm Mutual Automobile Insurance Company ("State Farm"), T.L. Thompson & Associates, Inc. ("T.L."), Wilber and Associates, P.C. d/b/a Wilber Group ("Wilber"), Gary Westcott, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections (the "Department"), and Keith E. Neal, in his official capacity as Commissioner of the Louisiana Officer of Motor Vehicles ("OMV") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This First Amended Class Action Complaint is filed pursuant to Federal Rules of Civil Procedure 15(a)(1)(B).
2. This is a class action brought by Plaintiffs, on behalf of themselves and others similarly situated, who are owners or operators of vehicles licensed in Louisiana, who had valid Louisiana driver's licenses, and who have been unlawfully threatened with, or actually

subjected to, suspension of their driving privileges to coerce payment of disputed private claims.

3. The Department, acting through the OMV (collectively, the “State”), has authority under certain statutes to only accept claims by an insured owner or operator as opposed to a subrogee of the owner or operator who reports an accident and who seeks information concerning the insured or uninsured status of the owner or operator of the other vehicle involved in the accident.

4. State Farm and the debt collection agencies it uses acting as owners or operators, including T.L. and Wilber, have developed and implemented a scheme to invoke that statutory framework to unlawfully coerce payments from Plaintiffs by using collection efforts that are illegal and unjust.

5. State Farm and the debt collection agencies it uses are not owners or operators, and their insureds have sustained no loss as evidenced by the subrogation. Their scheme unlawfully, unjustly, and abusively uses the State’s authority to force Plaintiffs into onerous payment obligations for private claims by threatening and/or causing suspension of Plaintiffs’ driver’s licenses, without a judicial determination of liability and, as such, without a legitimate debt. There is no inquiry as to whether Plaintiffs are at fault for an accident nor is there any evidence much less a determination of the existence or quantum of the claimed damage or injury.

6. The State’s suspension process, adopted, maintained, and/or ratified by Defendants Westcott and Neal in their official capacities, operates in a purely mechanical manner, relying exclusively on representations submitted by private actors (who are not operators of a motor vehicle and who are not covered by La. R.S. 32:871-872), without meaningful notice

to license holders and without a hearing or any inquiry into fault or liability, thereby creating a substantial risk of erroneous deprivation of a protected property interest.

7. By relying solely upon the representations made by the private actors (i.e., State Farm, T.L., and Wilber) and by exercising virtually no discretion in processing suspension requests, the State has effectively ceded its authority to those private actors, allowing them to impose license suspensions that operate as de facto, non-judicial judgments of fault without the procedural safeguards of the judicial system, thereby abrogating entirely our system of justice to these private actors.

8. Upon information and belief, State Farm and the State have established a data-exchange protocol that allows suspension requests to bypass human review.

9. Based on publicly available data and information obtained from OMV communications, upon information and belief, the State's rejection rate for these suspension requests is statistically negligible (near 0%), further confirming that no independent review occurs and that the State has abdicated its authority to private actors, such as Defendants T.L., Wilber, and State Farm.[1]

10. Once an owner or operator's driver's license is suspended, it may only be reinstated by making payment arrangements with State Farm through its debt collectors such as T.L. and Wilber, or by complying with the state statute unlawfully used by State Farm and its debt collectors. Because there is no judicially enforceable debt, these actions are tantamount to blackmail.

[1] Significantly, the fees Louisiana imposes on drivers seeking license reinstatement after insurance cancellation are among the highest, second only to Delaware. Reinstatement fees for insurance cancellation violations are more expensive than other violations, the amount owed increases the longer a lapse in insurance coverage continues, and one lapse in coverage can result in multiple violations. *See* Louisiana Legislative Auditor, Driver's License Issuance and Reinstatement Fees, Informational Report (Sept. 10, 2025), available at https://app2.lla.state.la.us/publicreports.nsf/0/9bd42e825929084c86258d0100523816/$file/00008b48a.pdf?openelement&.7773098.

11. As a result, private actors effectively create a debt based on an amount that they unilaterally determine—without any evidence whatsoever—which empowers them to dictate when and whether a Louisiana driver's license will be suspended, while the State performs a perfunctory role that gives legal effect to the representations of private actors, all in violation of Louisiana law and constitutional due process guarantees.

12. There is no legal basis for the license suspensions, and they are orchestrated through false and misleading representations by which State Farm and debt collectors such as T.L. and Wilber use the threat of license suspensions and actual license suspensions to force continued payments, regardless of whether the Plaintiffs can afford to pay and without due process of law. The most fundamental tenant of our law—Due Process—has been completely ignored.

13. This systemic course of conduct by State Farm, T.L., and Wilber, acting in concert with the State, constitutes a clear case of "joint action" wherein the State has delegated its authority to private parties for the purpose of debt collection, thus denying Plaintiffs their constitutionally protected due process rights.

14. These illegal threats and actual suspensions cause havoc on the personal lives of the Plaintiffs.

15. Plaintiffs Eric Mayshack, Erica Mayshack, and Ariel Lee, and the Class they seek to represent, suffered damages due to these unlawful practices, and State Farm, T.L., and Wilber have been unjustly enriched as a result.

## **THE PARTIES**

16. Plaintiff Ariel Lee is a resident of Caddo Parish, Louisiana and had a Louisiana driver's license as of April 15, 2024.

17. Plaintiff Eric Mayshack is a resident of Caddo Parish, Louisiana, was a resident of Caddo Parish, Louisiana at all times material to this action, and had a valid driver's license as of June 16, 2024.

18. Plaintiff Erica Mayshack is a resident of Caddo Parish, Louisiana, was a resident of Caddo Parish, Louisiana at all times material to this action, and had a valid driver's license as of June 16, 2024.

19. Defendant State Farm Mutual Automobile Insurance Company is an insurance company doing business in the State of Louisiana.

20. Defendant T.L. Thompson & Associates, Inc. is a Texas corporation that engages in debt collection practices in the State of Louisiana.

21. Defendant Wilber and Associates, P.C. d/b/a Wilber Group is an Illinois corporation that engages in debt collection practices in the State of Louisiana.

22. Defendants State Farm, T.L., and Wilber, acting in concert, constitute an association-in-fact enterprise distinct from the individual Defendants for the shared, ongoing purpose of unlawfully leveraging the State's authority to coerce payments from purported non-judgment debtors without any adjudication of fault or liability.

23. Defendant Gary Westcott is the Secretary of the Louisiana Department of Public Safety and Corrections. Secretary Westcott is sued in his official capacity for declaratory and prospective injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908). As Secretary of the Department, he is responsible for adopting rules to implement the provisions of the Louisiana Motor Vehicle Safety Responsibility Law (the "Safety Responsibility Law") and continues to enforce and maintain policies that result in ongoing and future violations of Plaintiffs' constitutional rights. *See* La. R.S. 32:851(1) (defining "Commissioner" to mean

the Department); and La. R.S. 32:852(A) ("The commissioner shall administer and enforce the provisions of this Chapter [the Safety Responsibility Law] and may make rules and regulations necessary for its administration and shall provide for hearings upon request of persons aggrieved by orders or acts of the commissioner under the provisions of this Chapter.").

24. Defendant Keith E. Neal is the Commissioner of the Louisiana Office of Motor Vehicles ("OMV"). Commissioner Neal is sued in his official capacity for declaratory and prospective injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908). Pursuant to La. R.S. 36:408(C), the OMV is delegated the authority to "perform the functions of the state relative to the examination and licensing of drivers of motor vehicles within the state, [and] the suspension and revocation of such licenses." Commissioner Neal is responsible for policies, rules, directives, and patterns or practices of OMV relative to the suspension of driver's licenses under the Safety Responsibility Law and continues to enforce and maintain policies that result in ongoing and future violations of Plaintiffs' constitutional rights.

## **JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, and 1343(a)(3), as Plaintiffs assert claims under 42 U.S.C. § 1983 ("Section 1983") and the Fourteenth Amendment of the United States Constitution.

26. Plaintiffs also seek declaratory and injunctive relief, and any other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202; and 42 U.S.C. § 1983.

27. In addition, this action arises under Chapter 96 of the United States Code, more commonly known as the Racketeer Influenced and Corrupt Organizations Act (herein abbreviated as the "RICO Act"). Civil RICO jurisdiction is conferred by 18 U.S.C. § 1964(c).

28. Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

29. Venue is proper in the Western District of Louisiana, Shreveport Division, pursuant to 28 U.S.C. § 1391(b)(2).

30. This Court has personal jurisdiction over the Defendants because they conduct business in the State of Louisiana.

**BACKGROUND**

31. The Louisiana legislature enacted a Safety Responsibility Law (La. R.S. 32:851 *et seq.*) that directs the State to take certain actions to ensure that drivers maintain liability insurance, to require security in the event of an accident, and to impose certain penalties on owners and operators of motor vehicles involved in accidents who do not comply with the statutory requirements.

32. Although the Louisiana Legislature has enacted this statutory framework, the existence of this statutory framework does not end the constitutional inquiry. Longstanding United States Supreme Court precedent makes clear that, regardless of statutory authorization, a State may not suspend a driver's license—a protected property interest—unless it first affords the procedural due process required by the Fourteenth Amendment. As a result, the Safety Responsibility Law must be applied in a manner consistent with federal constitutional requirements, including meaningful notice and an adequate opportunity to be heard before a suspension may occur.

33. The Safety Responsibility Law was enacted as a public-safety measure designed to promote future financial responsibility among drivers, not as a mechanism to adjudicate or enforce private civil liability. Here, as applied in practice, Defendants have converted this administrative licensing mechanism into a coercive debt-collection tool, permitting

unadjudicated private claims to trigger license suspensions without the procedural safeguards required by both the United States and Louisiana Constitutions.

34. Under the Safety Responsibility Law, an operator of a motor vehicle who is involved in an accident may report the accident in writing, declaring that the owner or operator's vehicle was covered by insurance, providing information about that coverage, posting security, and making a claim for damages. La. R.S. 32:871(A). If such operator is physically incapable of making such report, the owner of the motor vehicle may make the report. *Id*.

35. The Safety Responsibility Law does not authorize a third party, such as an insurance company like State Farm or a debt collector like T.L. or Wilber, to make such an accident report with the State. *See* La. R.S. 32:871(A).

36. The report is not required to be made under oath or to provide any evidence of actual damage or injury.

37. The owner or operator of a motor vehicle involved in an accident may obtain verification of whether the owner or operator of the other vehicle in the accident is insured. La. R.S. 32:871(B).

38. Upon receipt of a report of a motor vehicle accident under La. R.S. 32:871(A), the Secretary of the Department is required to take certain actions within 20 days of the report, which include determining whether the other driver has insurance coverage and determining an amount of security that will be sufficient to satisfy any judgment for damages as may be recovered from the owner or operator of the other vehicle. La. R.S. 32:872 (A), (C).

39. There is no actual standard proscribed for determining the amount of security required.

40. In practice, the State's determination is made automatically based on data submitted by private parties, without any independent investigation.

41. Under this statutory framework, when the Department has no proof of a liability policy covering the other vehicle at the time accident, the Department "shall suspend the license and all registrations of each operator and owner of a motor vehicle in any manner involved in such accident, … unless such operator or owner, or both, shall deposit security in the sum determined by the commissioner." La. R.S. 32:872(B).

42. The owner or operator of the other vehicle is afforded only ten (10) days after notice by the Department to satisfy the statutory requirements or have their driver's license suspended. La. R.S. 32:872(B).

43. The Safety Responsibility Law does not expressly require a pre-suspension hearing. At most, it requires the Department to provide for hearings upon request. La. R.S. 32:852(A) ("The commissioner shall administer and enforce the provisions of this Chapter and may make rules and regulations necessary for its administration and shall provide for hearings upon request of persons aggrieved by orders or acts of the commissioner under the provisions of this Chapter.").

44. However, the United States Supreme Court has held that driver's licenses are protected property interests and are not to be suspended without the procedural due process required by the Fourteenth Amendment. *Bell v. Burson*, 402 U.S. 535, 539 (1971).

45. Accordingly, before a driver's license may be suspended for failure to post security after an accident, due process requires a full and fair inquiry into fault and damages. *Id.* at 540.

46. Indeed, before a driver's license can be suspended, constitutional due process requires both: (a) sufficient notice and a meaningful opportunity to be heard; and (b) sufficient inquiry into fault and damages and a determination regarding liability.

47. However, the State fails to comply with these constitutional requirements.

48. Upon information and belief, the State provides some drivers subject to suspension under the Safety Responsibility Law with a standardized form entitled "Official Notification of Withdrawal of Driving Privileges Order of Security Following an Accident." The only reference to a hearing is contained in small print at the bottom of the standardized form, as follows:

> ADMINISTRATIVE HEARING: WITHIN THIRTY (30) DAYS FROM THE DATE OF THIS NOTICE, YOU MAY MAKE A WRITTEN REQUEST FOR AN ADMINISTRATIVE HEARING, AT WHICH TIME YOU WILL HAVE THE OPPORTUNITY TO CONTEST THIS SUSPENSION/REVOCATION ON THE BASIS OF IT'S CONFORMITY WITH THE LAW.
>
> NOTE: FOR MORE INFORMATION, YOU MAY CONTACT THIS OFFICE AT (225) 925-6146.

49. The standardized form provides no information as to how a licensee may meaningfully contest the deprivation of a protected property interest in a driver's license. The form does not identify the factual or legal basis for the proposed suspension, does not explain what issues may be considered at any hearing, and does not inform the licensee what facts or evidence would prevent the suspension of driving privileges.

50. Likewise, the standardized form fails to advise the licensee that the State will make a determination as to fault for the underlying accident, determine the existence or amount of any damages, or consider defenses prior to suspension.

51. The Safety Responsibility Law vests authority exclusively in the State and allows reporting exclusively by the owner or operator of a vehicle involved in an accident, not a debt collector nor insurance company.

52. Yet the State, pursuant to policies, practices, or customs adopted, maintained, or ratified by Defendants Westcott and Neal, suspends driver's licenses under the Safety Responsibility Law based exclusively on the representations from a private party (State Farm, T.L., and/or Wilber), without providing sufficient notice and opportunity for a hearing and, further, without conducting any inquiry into liability whatsoever.

53. State Farm, T.L., and Wilber have invoked and exploited the unlawful mechanism described above to threaten and cause the suspension of driver's licenses, including those of Plaintiffs.

54. Acting jointly with the State, State Farm, T.L., and Wilber have used this scheme to extort money out of Louisiana citizens who have never been provided with proper notice or any form of hearing and against whom no judgment had ever been entered.

55. On behalf of State Farm, both T.L. and Wilber routinely send letters to Louisiana citizens representing that payment of a subrogation claim is a statutory condition for maintaining their driver's licenses. This is objectively false under the Safety Responsibility Law, which requires only "security" or "proof of financial responsibility," not satisfaction of private, unadjudicated debts. Defendants intentionally and improperly conflate the statutory requirement of "posting security" (i.e., a deposit to the State to ensure future responsibility) with "paying subrogation" (a private transfer of wealth to an insurer).

56. State Farm, T.L., and Wilber have maintained a long-standing policy, pattern, and practice of coordinating their actions to use the threat of suspension as leverage to collect disputed private subrogation claims, rather than pursuing adjudication through the courts.

57. This practice is not incidental or isolated. It is a well-established joint scheme that Defendants have employed as a business model for years.

58. Many members of the proposed Class are working Louisianians who rely on their vehicles as their sole means of transportation in a state with limited public transit infrastructure. Louisiana invests little state money in public transit, and with limited public transportation options, few people around the state rely on buses or other transit to get to work.[2] Only 18 of Louisiana's 64 parishes have a public transportation system, such as a bus system.[3]

59. Although some Class members may be alleged to have violated insurance requirements, the Safety Responsibility Law, in conjunction with *Bell*, does not treat uninsured status as proof of fault for an accident, nor does it authorize the suspension of a driver's license without notice and a meaningful opportunity to be heard. Driving without insurance is a regulatory offense; it does not establish civil liability, wrongdoing in the accident, or a forfeiture of constitutional rights.

60. By suspending licenses without any inquiry into fault or liability and without affording constitutionally adequate notice or hearing, Defendants impose a severe and disproportionate penalty that effectively bars affected individuals from working, attending school, obtaining medical care, and meeting basic needs—a deprivation that Defendants knowingly exploit to coerce payment of disputed private claims.

## STATEMENT OF FACTS

### Ariel Lee

61. Ariel Lee is a resident of Louisiana who, as of April 2024, had a valid Louisiana driver's license.

---

[2] *See* The Public Affairs Research Council of Louisiana Snapshot at p. 1, available at https://parlouisiana.org/wp-content/uploads/2023/01/PAR-Snapshot-1.24.23.pdf (last visited February 4, 2026).
[3] *See* The Public Affairs Research Council of Louisiana Snapshot at p. 3, available at https://parlouisiana.org/wp-content/uploads/2023/01/PAR-Snapshot-1.24.23.pdf (last visited February 4, 2026).

62. On April 15, 2024, while Ariel Lee was operating a vehicle in Shreveport, Louisiana, she was involved in an automobile accident with another vehicle operated by Rosemary Gage.
63. The April 15, 2024 accident report recounts a swearing match, where each party claims to have the green light. Moreover, the reviewing officer reported "no contributing action" on the part of Ariel Lee at the time of the crash. With respect to Rosemary Gage, however, the officer reported the following driver action at the time of the crash: "Operated motor vehicle in inattentive, careless, negligent, or erratic manner."
64. On October 23, 2024, at the behest of State Farm, T.L., a collections agency, wrote to the State and made a "formal request to suspend the owner's registration of Ariel Lee."
65. This letter was sent via United States Mail.
66. T.L. falsely claimed that Ms. Lee "was factored as being responsible for the automobile collision [with Ms. Gage], and has failed to take financial responsibility for the damages caused."
67. T.L. requested that the matter be reviewed for "license suspension."
68. On information and belief, T.L. enclosed "supporting documentation" that consisted of Ms. Gage's claim with her insurer, State Farm, and with a referenced police report. It is unclear whether the police report was included in T.L.'s submission to the State.
69. Crucially, in this letter sent via US Mail, T.L. knowingly and intentionally omitted the material fact that no judicial or administrative finding of fault or liability had been made against Ms. Lee, nor had any judgment for damages been entered, as required by *Bell*.
70. T.L. omitted this material fact because it was aware that the State's process for suspension under the statute is a perfunctory administrative act triggered only by the private party's representation of failure to take financial responsibility.

71. On information and belief, the State received T.L.'s letter on November 6, 2024.

72. While the face of the letter indicates that Ms. Lee was copied, Ms. Lee never received a copy of the letter as the address used by T.L. was in Oklahoma and not a valid mailing address for Lee.

73. On or about July 2025, Ms. Lee learned that her Louisiana driver's license had been suspended.

74. The State simply took State Farm's word for the assertion that Ms. Lee was at fault and for the measure of damages.

75. T.L. knowingly and intentionally omitted the lack of a judicial fault finding/judgment, and the fraudulent omission resulted in the suspension of Ms. Lee's driver's license

76. Ms. Lee never received notice from the State or any other state entity and was never advised by the State or any other entity that she needed to take any action to avoid suspension of her driver's license.

77. Ms. Lee was specifically not provided with any notice of the ability to request a hearing to contest her liability or fault prior to the suspension of her license.

78. As a result, Ms. Lee was deprived of her license without any opportunity to contest fault, present the police report, or be heard before losing a critical means of transportation.

**Erica Mayshack**

79. Erica Mayshack is a resident of Louisiana who, as of March 2025, had a valid Louisiana driver's license.

80. On June 16, 2024, while Erica Mayshack was operating a vehicle in Shreveport, she was involved in an automobile accident with another vehicle operated by Robin Robinson and owned by Latoya Young.

81. Notably, the June 16, 2024 accident report contained conflicting narratives as to how the accident occurred, and the point of impact documented by the reviewing officer supports Erica Mayshack's description of events. Furthermore, although the reviewing officer marked Erica Mayshack as inattentive, he reported "no contributing action" on the part of Erica Mayshack at the time of the crash. With respect to Robin Robinson, however, the officer marked that she was inattentive and also reported the following driver action on Ms. Robinson's part at the time of the crash: "Improper turn."

82. Prior to the collection efforts of Wilber, Ms. Mayshack possessed a valid Louisiana license, as follows:

| | |
|---|---|
| LICENSE TYPE: | NON COMMERCIAL |
| STATE CLASS CODE: | E |
| LICENSE CLASS: | ALL TYPE NON COMMERCIAL VEH |
| RESTRICTIONS: | GLASSES/CONTACTS |
| ENDORSEMENTS: | NONE |

83. Sometime after the accident and prior to March of 2025, Wilber, acting on behalf of State Farm, informed Ms. Mayshack that she was responsible for $37,911.42 in damages to the vehicle of a driver insured by State Farm related to the June 16, 2024 motor vehicle accident, and Wilber wrote the State requesting her license be suspended. Shortly thereafter, Ms. Mayshack learned that her driver's license had or would be suspended in March or April of 2025.

84. In response to the pending suspension, on or about April 11, 2025, Ms. Mayshack entered into an installment agreement with Wilber to avoid suspension of her license.

85. On or about September 11, 2025, Erica Mayshack received a letter from Wilber advising that Ms. Mayshack had broken a payment arrangement that she had agreed to and that Wilber had contacted the State to review her driver's license for suspension.

86. This letter was sent via United States Mail.

87. Ms. Mayshack received notice from the State that she needed to take action to avoid suspension of her driver's license by paying the debt to Wilber.

88. This letter was sent via United States Mail.

89. On information and belief, Wilber, in requesting Ms. Mayshack's license suspension, knowingly and intentionally omitted the lack of a judicial fault finding/judgment as required by *Bell*, and the fraudulent omission resulted in the suspension of Ms. Mayshack's driver's license.

90. Again, the State simply took State Farm's word for the assertion that Ms. Mayshack was at fault and for the measure of damages.

91. Upon information and belief, Ms. Mayshack was specifically not provided with any notice of the ability to request a hearing to contest her liability or fault prior to the suspension of her license.

92. On or about October 6, 2025, Wilber sent another letter to Ms. Mayshack threatening that it may request suspension of her driver's license if she did not pay the remaining balance of $34,656.38:

October 6 2025

Dear Erica Rernice Mayshack,

| | |
|---|---|
| **Wilber File Number:** | 30681384 |
| **Online Access Key:** | VSYBIBJ |
| **Accident Date:** | 06-16-24 |
| **Our Client:** | State Farm Insurance Co. |
| **Client Claim Number:** | 18-69L6-73F |
| **Current Claim Amount:** | $34 656.38 |
| **Accident Location:** | SHREVEPORT LA |

Our client believes you or your motor vehicle were involved and at-fault in this accident. If you do not have insurance coverage, you may be in violation of the financial responsibility laws of your state.

In many cases **YOUR DRIVER'S LICENSE** and/or **VEHICLE TAGS** can be **SUSPENDED** if you are in violation of your state's insurance requirement.

Financial responsibility laws make insurance mandatory in most states. We may request **SUSPENSION** of your **DRIVER'S LICENSE** and/or **REMOVAL** of your **VEHICLE LICENSE PLATE REGISTRATION** if allowed by the financial responsibility laws of your state.

If you did not have insurance on the date of the accident and wish to resolve the matter without further action, or if you have other information we are not aware of, act quickly by calling our office (800-313-5169). If you were uninsured for this claim, our client is seeking reimbursement from you directly for the current claim amount of **$34 656.38**. If you did have insurance, please return the form below or text **INS** to **55859**.

**HOW TO PAY**
Get claim info online
or give us a quick call (800-313-5169).

**Get Started Now**
www.wilberpay.com

**Customer Service**
800-313-5169

A LEGAL JUDGMENT MAY BE REQUIRED BY YOUR STATE TO SUSPEND DRIVERS LICENSE AND/OR VEHICLE LICENSE PLATE REGISTRATION FOR VIOLATIONS OF FINANCIAL RESPONSIBILITY LAWS.

101HWWILB20505_399173578

**Eric Mayshack**

93. Eric Mayshack is a resident of Louisiana who, as of March 10, 2025 and prior to the collection efforts by Wilber, possessed a valid Louisiana commercial driver's license, as follows:

STATE CLASS CODE: A
LICENSE CLASS: ANY COMB VEH > 26K WITH TRAILER > 10K
STATUS: PERSONAL - VALID
COMMERCIAL - VALID
RESTRICTIONS: NONE
ENDORSEMENTS: CYCLE ENDORSEMENT
COMBINATIONS TANK AND HAZARDOUS MATERIALS

94. Sometime before February 12, 2025, Wilber wrote to the State requesting that Mr. Mayshack's license be suspended. It is not clear on what date, Mr. Mayshack's license was

suspended. On or about March 10, 2025, Mr. Mayshack received a letter from Wilber advising that his "driver's license and/or registration was scheduled to be suspended" as a result of an "incident that occurred on 6/16/2024" and reflecting a current balance owed of $37,911.42.

95. In the March 10, 2025 letter, Wilber represented that it was acting on behalf of State Farm, which provided insurance coverage to the other driver involved in the June 16, 2024 incident.

96. Mr. Mayshack was not involved as an operator of a vehicle in the June 16, 2024 incident referenced by Wilber in the March 10, 2025 letter. Rather, he was the owner of the vehicle, which was operated by his major daughter, Erica Mayshack, and which was involved in an automobile accident in Shreveport, Louisiana, with another vehicle owned by Latoya Young and operated by Robin Robinson.

97. At no time prior to the suspension of his license had Mr. Mayshack been adjudicated at fault for any automobile accident or determined to owe damages to any other party.

98. On or about March or April 2025, Mr. Mayshack learned that his driver's license had been suspended. In response to the pending suspension, Mr. Mayshack entered into an installment agreement with Wilber to avoid suspension of his license.

99. Mr. Mayshack received notice from the State that he needed to take action to avoid suspension of his driver's license.

100. This letter was sent via United States Mail.

101. Upon information and belief, Mr. Mayshack was specifically not provided with any notice of the ability to request a hearing to contest his liability or fault prior to the suspension of his license.

102. On or about October 6, 2025, Wilber sent another letter to Mr. Mayshack threatening that it may request suspension of his driver's license if he did not pay the remaining balance of $34,656.38:

October 6 2025

Dear Eric Mayshack,

Our client believes you or your motor vehicle were involved and at-fault in this accident. If you do not have insurance coverage, you may be in violation of the financial responsibility laws of your state.

In many cases **YOUR DRIVER'S LICENSE** and/or **VEHICLE TAGS** can be **SUSPENDED** if you are in violation of your state's insurance requirement.

| | |
|---|---|
| **Wilber File Number:** | 30681384 |
| **Online Access Key:** | FMV8VOJ |
| **Accident Date:** | 06-16-24 |
| **Our Client:** | State Farm Insurance Co. |
| **Client Claim Number:** | 18-69L6-73F |
| **Current Claim Amount:** | $34 656.38 |
| **Accident Location:** | SHREVEPORT LA |

Financial responsibility laws make insurance mandatory in most states. We may request **SUSPENSION** of your **DRIVER'S LICENSE** and/or **REMOVAL** of your **VEHICLE LICENSE PLATE REGISTRATION** if allowed by the financial responsibility laws of your state.

If you did not have insurance on the date of the accident and wish to resolve the matter without further action, or if you have other information we are not aware of, act quickly by calling our office (800-313-5169). If you were uninsured for this claim, our client is seeking reimbursement from you directly for the current claim amount of **$34 656.38**. If you did have insurance, please return the form below or text **INS** to **55859**.

**HOW TO PAY**
Get claim info online
or give us a quick call (800-313-5169).

**Get Started Now**
www.wilberpay.com

**Customer Service**
800-313-5169

A LEGAL JUDGMENT MAY BE REQUIRED BY YOUR STATE TO SUSPEND DRIVERS LICENSE AND/OR VEHICLE LICENSE PLATE REGISTRATION FOR VIOLATIONS OF FINANCIAL RESPONSIBILITY LAWS.

101HWWILB20505_399173572

## CLASS REPRESENTATION ALLEGATIONS

103. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of a class defined as follows ("the Class"):

> All persons who held a Louisiana driver's license or a driver's license from another jurisdiction at any time on or after October 22, 2015, and who, on or after that date, were sent a written communication by Wilber and Associates, P.C. and/or T.L. Thompson & Associates, Inc., acting on behalf of State Farm Mutual Automobile

Insurance Company, that threatened to take action to have said person's driver's license or driving privileges within this state suspended or had said person's driver's license or driving privileges within this state suspended unless said person agreed to pay a certain sum in full or in installments for damages purportedly sustained by an insured of State Farm for which said person was claimed to be at fault.

**Numerosity**

104. At this time, Plaintiffs do not know the exact number of members of the Class. The precise number of Class members is within the exclusive control of Defendants. However, given the volume of the business conducted by T.L. and Wilber on State Farm's behalf, there are at least hundreds of members of the Class if not several thousand.

105. This estimate is based on T.L., Wilber, and State Farm's systematic and years-long policy and practice of using the Safety Responsibility Law to extort payments through driver's license suspension threats and actions.

106. Joinder of members of the Class is also impracticable because many members are unaware that their rights under the U.S. Constitution have been violated or that they are entitled to seek redress in court. Members of the proposed Classes are also spread out across the state of Louisiana, and they are typically people who lack financial resources to retain an attorney to bring an independent action or to be joined in this action.

**Commonality**

107. This action presents questions of law and fact common to Plaintiffs and the Class that are capable of class-wide resolution, including:

(a) whether Defendants maintained and implemented uniform policies and practices of invoking the Safety Responsibility Law to threaten or cause driver's license suspensions to collect private subrogation claims;

(b) whether Defendants acted jointly and under color of state law in doing so;

(c) whether Defendants' standardized communications and submissions to the State omitted material facts concerning the absence of adjudicated fault or liability;

(d) whether Defendants' conduct deprived Plaintiffs and Class members of constitutionally required notice and a meaningful opportunity to be heard; and

(e) whether Defendants' conduct resulted in unjust enrichment and constituted racketeering activity under federal law.

**Typicality**

108. Typicality does not require identical factual circumstances. Plaintiffs' claims arise from the same course of conduct and are based on the same legal theories as the claims of the Class. Plaintiffs' claims are typical of the claims of the Class because members of the Class, like Plaintiffs, have had their driving privileges suspended by the State without proper notice and due process by the State or have had their driving privileges threatened by State Farm debt collectors Wilber and/or T.L. acting under color of state law.

**Adequacy**

109. Plaintiffs will fairly and adequately protect the interests of the Class.

110. Plaintiffs have competent and capable attorneys who are experienced trial lawyers.

111. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have financial resources to do so.

112. Neither Plaintiffs nor their counsel possess interests that conflict with the Class they seek to represent.

113. Plaintiffs understand the duties and responsibilities of serving as class representatives and are willing to actively participate in the prosecution of this action on behalf of the Class.

**Predominance and Superiority**

114. The Class meets the requirements for certification for monetary relief because the questions of law or fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy and absent a class action, as a practical matter, given the nature of State Farm, T.L., and Wilber's actions in negotiating payment with a person who has little recourse but to comply with this unlawful behavior and the State's cooperation with this scheme, members of the Class will be unable to obtain redress and Defendants' unlawful and unjust conduct will continue without remedy.

115. Any individualized issues relating to damages do not defeat predominance and may be addressed in subsequent proceedings, if necessary.

116. It would be a substantial hardship for most individual members of the Class to prosecute their claims individually in separate actions.

117. A class will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

118. The lawsuit presents no difficulties that would impede its management by the Court as a class action.

119. Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

### Class-Wide Injunctive and Declaratory Relief

120. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole pursuant to Federal Rule of Civil Procedure 23(b)(2).

121. Defendants' liability turns on common proof concerning their standardized policies, practices, and communications, and does not depend on individualized determinations of fault, insurance coverage, or damages.

## <u>CAUSES OF ACTION</u>

### COUNT I: Violation of Due Process Under the Fourteenth Amendment; 42 U.S.C. § 1983 (Suspension Without Fault or Liability Determination in Violation of *Bell*) *Class Action Claim Against All Defendants*

122. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

123. With respect to Defendants Westcott and Neal, Plaintiffs do not challenge the State's authority to regulate driving privileges, but rather the constitutionally inadequate procedures employed in suspending those privileges.

124. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

125. The Due Process Clause prohibits the State and those acting under color of state law from subjecting individuals to processes and penalties that fail to comport with principles of due process and fundamental fairness.

126. Plaintiffs have a substantial interest in their driver's licenses. The United States Supreme Court has held that driver's licenses are protected property interests under the United States

Constitution that are "essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539 (1971).

127. Suspension of issued licenses involves state action that adjudicates important interests of the licensees. *Bell*, 402 U.S. at 539. In such cases, the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. *Id*.

128. Before suspension of a driver's license for failure to post security after an accident, due process requires a full and fair inquiry into fault and damages. *Id.* at 540.

129. Under the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the procedures employed by Defendants are constitutionally deficient because: (a) Plaintiffs possess a substantial private interest in their driver's licenses, which are essential to employment and daily life; (b) Defendants' automated and ex parte suspension process creates an unacceptably high risk of erroneous deprivation in the absence of notice and a pre-deprivation hearing; and (c) the provision of minimal additional safeguards—such as notice of alleged fault and an opportunity to contest liability, both of which are required by *Bell*—would impose little to no administrative burden on the State.

130. In this case, the minimal due process safeguards have not been met. Instead, at all relevant times, all Defendants—Secretary Westcott, Commissioner Neal, State Farm, T.L., and Wilber—have acted under color of state law to deny the Plaintiffs the due process to which each is entitled.

131. In his official capacity, Secretary Westcott is the final decisionmaker as to the State's suspension of driver's licenses pursuant to the Safety Responsibility Law and the establishment of policy and practice concerning the indefinite suspension of driver's

licenses pursuant to that law. Secretary Westcott is therefore responsible for ongoing violations of the right to due process under the law to Plaintiffs and members of the Class.

132. Likewise, in his official capacity, Commissioner Neal is responsible for the OMV's policies, rules, directives, and patterns or practices relative to the suspension of driver's licenses under the Safety Responsibility Law. Commissioner Neal is therefore responsible for ongoing violations of the right to due process under the law to Plaintiffs and members of the Class.

133. As implemented and enforced by the State, the Safety Responsibility Law operates to deprive Plaintiffs and other members of the Class of their driving privileges without the requisite hearing and liability determination.

134. Under the State's suspension process, a driver's license is suspended automatically upon receipt of submissions from private parties unless the affected driver posts security or enters into a payment arrangement, regardless of whether any judicial or administrative determination of liability has been made.

135. The State's suspension of Plaintiffs' driver's licenses further demonstrates that the suspension process operates as a rubber-stamp of private submissions rather than a constitutionally required inquiry into fault or liability. In both the Ariel Lee and Erica Mayshack incidents, the police reports available to Defendants reflected, at a minimum, a genuine dispute as to liability and, in critical respects, affirmatively indicated that Plaintiffs were not at fault for the underlying accidents. Nevertheless, the State suspended Plaintiffs' driver's licenses without addressing or acknowledging those findings, confirming that no independent review of fault, liability, or damages occurred prior to suspension.

136. This suspension process constitutes a deprivation of a protected property interest by Defendants under color of state law.

137. Defendants State Farm, T.L., and Wilber are private entities that knowingly invoked and exploited the State's suspension process to cause the deprivation of Plaintiffs' driver's licenses.

138. A party is subject to suit under 42 U.S.C. § 1983 when the deprivation of rights stems from conduct fairly attributable to the State. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

139. A private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment. *Lugar*, 457 U.S. at 941.

140. Moreover, joint participation does not require more than invoking the aid of State officials when the State has created a system whereby state officials will attach property on the *ex parte* application of one party to a private dispute. *Lugar*, 457 U.S. at 942.

141. The deprivation of Plaintiffs' licenses was caused by the exercise of a state-created procedure that suspends driver's licenses without the requisite due process, in violation of the Fourteenth Amendment, and by the willful participation of State Farm, T.L., and Wilber in invoking that procedure.

142. State Farm, T.L., and Wilber are sophisticated, repeat participants in the State's suspension process and are aware that the process results in license suspension without the requisite hearing and without any inquiry into—much less determination of—fault, liability, or damages.

143. In order to coerce money from Plaintiffs, State Farm, T.L., and Wilber invoked the constitutionally invalid procedure created by the State to deprive Plaintiffs of their property right to their driver's licenses.

144. State Farm, T.L., and Wilber repeatedly submitted letters to the State seeking license suspensions and relied on the State's automatic enforcement of those submissions to cause the unconstitutional deprivation of Plaintiffs' driver's licenses.

145. Because State Farm, T.L., and Wilber set into motion the procedures that resulted in the suspension of Plaintiffs' driver's licenses, State Farm, T.L., and Wilber were joint participants with the State in the deprivation of Plaintiffs' protected property interests.

146. The conduct of State Farm, T.L., and Wilber went beyond mere reporting and constituted willful participation in joint activity with state officials sufficient to render them state actors for purposes of Section 1983.

147. Defendants have created an ongoing and coordinated system whereby the State suspends licenses based solely on the *ex parte* submissions of the private actors, which constitutes a "joint action" or "meeting of the minds."

148. Upon information and belief, State Farm and the State have established a data-exchange protocol that allows suspension requests to bypass human review, further supporting a "meeting of the minds" to automate the deprivation of rights.

149. The State acted jointly with State Farm, T.L., and Wilber by knowingly allowing State Farm, T.L., and Wilber to invoke the Safety Responsibility Law, even though they are not "owners" or "operators" of a vehicle involved in an accident as provided by statute.

150. In addition, the State acted jointly with State Farm, T.L., and Wilber by automatically suspending Plaintiffs' driver's licenses, based solely on *ex parte* representations made by

State Farm, T.L., and Wilber and without independent investigation, thereby transforming the private interests into state action.

151. State Farm, T.L., and Wilber submitted letters to the State seeking suspension and relied on the State's practice of treating such submissions as dispositive in order to extort payments from Plaintiffs.

152. In addition, the State acted jointly with State Farm, T.L., and Wilber by allowing State Farm, T.L., and Wilber to utilize this unconstitutional mechanism to collect fees as a result of the deprivation of Plaintiffs' rights.

153. The ongoing system and policy created by Defendants are effectively an agreement by Defendants to use state procedures to deprive Plaintiffs of their driver's licenses without due process and allows the private actors to utilize this mechanism to collect debts.

154. Defendants' collections scheme violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

155. Defendants' conduct under color of state law foreseeably and directly caused damages to Plaintiffs, including loss of their driver's licenses, loss of income and mobility, and the taking of sums of money to which State Farm, T.L., and Wilber are not entitled.

156. All people whose driver's licenses have been suspended as a result of Defendants' conduct are similarly situated with respect to their right to due process under the Fourteenth Amendment.

157. Plaintiffs and the Class are entitled to declaratory and injunctive relief, including reinstatement of suspended driver's licenses, from Defendants Westcott and Neal.

158. Additionally, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as compensatory damages, punitive damages, attorney fees, and all other relief available under applicable law, from Defendants T.L., Wilber, and State Farm.

**COUNT II: Violation of Due Process Under the Fourteenth Amendment; 42 U.S.C. § 1983 (Inadequate Notice and Hearing Procedures)**
***Class Action Claim Against Secretary Westcott and Commissioner Neal***

159. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

160. Plaintiffs do not challenge the State's authority to regulate driving privileges, but rather the constitutionally inadequate procedures employed in suspending those privileges.

161. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

162. "For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (internal quotations omitted).

163. The right to prior notice and a prior hearing is central to the Constitution's command of due process. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).

164. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. *Fuentes*, 407 U.S. at 80.

165. Notice must be reasonably calculated to apprise interested parties of the pendency of the action and to afford them a timely opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950).

166. Where the State threatens to impose a deprivation, due process requires notice that is sufficiently specific to inform the affected party of the critical issues to be addressed at the hearing, so that the opportunity to be heard is meaningful. *See Turner v. Rogers*, 564 U.S. 431, 447 (2011); *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970).

167. Notice that fails to accurately inform a licensee of the basis for the proposed suspension, the issues to be decided, and the means by which the suspension may be contested is constitutionally insufficient and equivalent to no notice at all.

168. To the extent Plaintiffs received any notice of the opportunity for a hearing prior to the suspension of their licenses, any such notice failed to accurately describe the legal rights and options available to Plaintiffs.

169. Under the direction of Secretary Westcott and Commissioner Neal, the State provides licensees facing suspension under the Safety Responsibility Law with a standardized form that fails to identify the critical issues to be decided and fails to explain how suspension may be meaningfully contested.

170. These deficiencies create a substantial risk of erroneous deprivation by preventing licensees from understanding that fault, liability, and damages may be contested prior to suspension.

171. The State's standardized form, which is the only notice provided to people regarding a pending suspension for failure to pay security following an accident, buries the notice of hearing in small print at the bottom of the form and does not inform licensees whether fault, liability, or damages will be adjudicated, does not explain what evidence may be presented, and does not advise licensees how to prevent suspension other than through posting security or making payment.

172. The failure to explain what issues may be raised or what evidence may be presented renders any purported opportunity for a hearing illusory rather than meaningful.

173. Thus, the State does not provide constitutionally adequate pre-deprivation notice to people facing a pending, indefinite driver's license suspension.

174. Secretary Westcott and Commissioner Neal are responsible for the policies, practices, and procedures governing notice and hearings under the Safety Responsibility Law and for the ongoing enforcement of those procedures.

175. At all relevant times, Secretary Westcott and Commissioner Neal acted under color of state law.

176. The State's failure to provide constitutionally adequate notice and a meaningful opportunity to be heard before suspending driver's licenses violates the Due Process Clause of the Fourteenth Amendment.

177. Plaintiffs and the Class have suffered and will continue to suffer irreparable injury as a result of the ongoing enforcement of these unconstitutional procedures.

178. Plaintiffs and the Class seek declaratory and prospective injunctive relief to remedy relief against Defendants Secretary Westcott and Commissioner Neal, in their official capacities, to remedy and prevent ongoing violations of the Fourteenth Amendment.

**COUNT III: Violation of the Louisiana Constitutional Due Process Clause**
**(Suspension Without Fault or Liability Determination in Violation of *Bell*)**
***Class Action Claim Against All Defendants***

179. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

180. Plaintiffs do not challenge the State's authority to regulate driving privileges, but rather the constitutionally inadequate procedures employed in suspending those privileges.

181. In addition to violating the Federal Constitution's due process guarantee, Defendants' actions violate Article I, Section 2 of the Louisiana Constitution.

182. Article I, Section 2 of the Louisiana Constitution provides that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

183. Louisiana recognizes that a driver's license is a property interest that cannot be suspended or revoked without due process of law. *Butler v. Dept. of Public Safety and Corrections*, 609 So.2d 790, 792 (La. 1992) (citing *Bell*, 402 U.S. 535).

184. Louisiana grants due process rights parallel to those recognized by the Federal Constitution. *Progressive Sec. Ins. Co. v. Foster*, 711 So.2d 675, 688 (La. 1998).

185. As set forth above, under the Safety Responsibility Law as implemented and enforced by the State, Plaintiffs and members of the Class were deprived of their driver's licenses through an administrative process that operates *ex parte*, without any determination of fault, liability, or damages.

186. The State's procedures permit suspension of driver's licenses based solely on submissions from private entities and without meaningful pre-deprivation process.

187. As applied to Plaintiffs and the Class, the State's suspension practices further demonstrate that driver's license suspensions are imposed through a mechanical, non-discretionary process rather than a meaningful evaluation of fault or liability. In the cases of Ariel Lee and Erica Mayshack, contemporaneous police reports reflected disputed liability and, in material respects, indicated that Plaintiffs were not responsible for causing the accidents. Despite these findings, the State suspended Plaintiffs' driver's licenses without any inquiry or explanation, underscoring that the suspension process functions as an automatic

enforcement mechanism for private demands rather than a constitutionally adequate adjudicative process under Article I, Section 2 of the Louisiana Constitution.

188. As applied to Plaintiffs and the Class, the State's suspension process violates Article I, Section 2 of the Louisiana Constitution because it authorizes and effectuates the deprivation of a protected property interest without constitutionally adequate notice and a meaningful opportunity to be heard.

189. Louisiana follows federal law in recognizing that a private entity may be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state. *See Fontenot v. Sw. Louisiana Hosp. Assn*, 00-00129 (La. App. 3 Cir. 12/6/00), 775 So.2d 1111, 1117.

190. As set forth above, State Farm, T.L., and Wilber knowingly invoked and exploited this state-created suspension process, acting jointly with the State to cause the deprivation of Plaintiffs' driver's licenses without the process required by Louisiana law.

191. The conduct of Defendants resulted in the suspension of Plaintiffs' driver's licenses and the coercive extraction of money from Plaintiffs and members of the Class in the absence of any judicial or administrative determination of fault or liability.

192. Plaintiffs and the Class have suffered damages as a direct and proximate result of Defendants' unconstitutional conduct, including loss of driver's licenses, loss of income and mobility, and the taking of money to which Defendants were not legally entitled.

193. All people whose driver's licenses have been suspended as a result of Defendants' conduct are similarly situated with respect to their right to due process under Article I, Section 2 of the Louisiana Constitution.

194. Plaintiffs and the Class are entitled to declaratory and injunctive relief, including reinstatement of suspended driver's licenses, from Defendants Westcott and Neal.

195. Additionally, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as damages, attorney fees, and all other relief available under applicable law, from Defendants T.L., Wilber, and State Farm.

**COUNT IV: Violation of Due Process Under the Louisiana Constitution**
**(Inadequate Notice and Hearing Procedures)**
***Class Action Claim Against Secretary Westcott and Commissioner Neal***

196. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

197. This Count challenges the constitutionality of the notice and hearing procedures employed by the State and does not contest the State's general authority to regulate driving privileges.

198. In addition to violating the Federal Constitution's guarantee of procedural due process, Defendants' actions violate Article I, Section 2 of the Louisiana Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

199. Louisiana grants due process rights parallel to those recognized by the Federal Constitution. *Progressive Sec. Ins. Co. v. Foster*, 711 So.2d 675, 688 (La. 1998).

200. Louisiana recognizes that a driver's license is a property interest that cannot be suspended or revoked without due process of law. *Butler v. Dept. of Public Safety and Corrections*, 609 So.2d 790, 792 (La. 1992) (citing *Bell*, 402 U.S. 535).

201. Under the Safety Responsibility Law as implemented and enforced by the State, Plaintiffs and members of the Class were deprived of their driver's licenses through an administrative

process that operates *ex parte* and without affording licensees meaningful notice or an opportunity to contest fault, liability, or damages prior to suspension.

202. Plaintiffs were not provided with constitutionally adequate notice or a meaningful opportunity to request a hearing prior to the suspension of their driver's licenses.

203. These deficiencies create a substantial risk of erroneous deprivation by preventing licensees from understanding that liability and fault may be contested prior to suspension.

204. The State's procedures fail to provide notice sufficient to inform Plaintiffs and other affected licensees of the critical issues to be decided prior to the suspension determination, including the opportunity to contest liability.

205. In addition, the State's procedures fail to afford a meaningful opportunity to contest liability or fault before a neutral decision-maker prior to suspension.

206. As implemented and enforced by Secretary Westcott and Commissioner Neal, the State's notice and hearing procedures violate the procedural due process guarantees of Article I, Section 2 of the Louisiana Constitution.

207. Plaintiffs and the Class have suffered and will continue to suffer irreparable harm as a result of these constitutional violations.

208. Plaintiffs and members of the Class are entitled to declaratory and prospective injunctive relief, including reinstatement of their driver's licenses and a declaration of their right to constitutionally adequate notice and a meaningful opportunity to be heard.

**COUNT V: Abuse of Right Under Louisiana Law**
***Class Action Claim Against State Farm, T.L., and Wilber***

209. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

210. Louisiana law recognizes the doctrine of abuse of rights, which prohibits the exercise of a legal right in a manner that is contrary to moral rules, good faith, or elementary fairness, or for a purpose other than that for which the right was granted.

211. An abuse of rights occurs when one of the following conditions exists: (1) the predominant motive for exercise of the right is to cause harm; (2) there is no serious or legitimate motive for exercise of the right; (3) the exercise of the right violates moral rules, good faith, or elementary fairness; or (4) the exercise of the right is for a purpose other than that for which it was granted.

212. The right abused by Defendants State Farm, T.L., and Wilber is the statutory privilege to invoke and initiate the driver's license suspension process under the Safety Responsibility Law by submitting representations to the State that trigger suspension proceedings.

213. Although the authority to suspend a driver's license is a sovereign police power reserved to the State, Defendants State Farm, T.L., and Wilber were granted access to and knowingly exploited the State's suspension mechanism in a manner that effectively caused suspensions to occur without judicial oversight or meaningful administrative review.

214. Moreover, State Farm, T.L., and Wilber knowingly and systematically invoked the State's suspension process for the primary purpose of coercing payment of disputed private claims, rather than for any purpose related to public safety or welfare.

215. The predominant motive for State Farm, T.L., and Wilber's invocation of the suspension process was not compliance with public-safety objectives, but the coercive extraction of private payments.

216. This collections scheme constitutes an abuse of rights under Louisiana law.

217. The Safety Responsibility Law was enacted to protect the public and promote future financial responsibility, not to serve as a private debt-collection mechanism.

218. State Farm, T.L., and Wilber invoked the State's suspension process for a purpose other than that for which the law was created, namely, to bypass the judicial process ordinarily required to adjudicate fault and liability and to extract payment of unadjudicated private claims through the threat and imposition of license suspension.

219. This conduct was undertaken in bad faith and in violation of moral rules and elementary fairness. State Farm, T.L., and Wilber sought to leverage the severe consequences of license suspension, including loss of mobility and loss of employment opportunities, to force payment of disputed claims regardless of merit and without even the semblance of due process.

220. Defendants State Farm, T.L., and Wilber are liable for all damages foreseeably caused by their abuse of rights under Louisiana law.

221. Based on the abuse of rights, and pursuant to Louisiana Civil Code Article 2315, Plaintiffs and the Class are entitled to damages for the harm caused by suspension of their driver's licenses.

**COUNT VI: Violation of the Federal RICO Act**
***Class Action Claim Against State Farm, T.L., and Wilber***

222. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

223. Pursuant to 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"

224. Any person injured in his or her business or property by reason of a violation of section 1962 shall recover treble damages, costs, and reasonable attorneys' fees. 18 U.S.C. § 1964(c).

225. To state a civil RICO claim under § 1962(c), a plaintiff must adequately plead that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020).

226. A RICO plaintiff must also plausibly allege that the RICO violation proximately caused the plaintiff's injuries. *Molina-Aranda*, 983 F.3d at 784. The proximate causation standard in this context is not one of foreseeability; instead, the plaintiff must demonstrate that the alleged violation "led directly" to the injuries. *Id*.

**The RICO Defendants and Misconduct**

227. The Defendants liable under this count are State Farm, T.L., and Wilber (the "RICO Defendants," collectively). The basis of liability for each is their direct participation in and management of the enterprise's affairs through the commission of predicate acts of extortion and mail fraud, as set forth herein.

**Other Wrongdoers (Non-Defendant)**

228. The State, while not a named in this Count, acted as a passive instrument of the enterprise by predictably and mechanically processing the fraudulent suspension requests.

**The RICO Enterprise**

229. A RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

230. An association-in-fact enterprise: (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure. *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015).

231. To plead an association-in-fact enterprise, a plaintiff must allege three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States,* 556 U.S. 938, 945 (2009).

232. Here, the enterprise is an association-in-fact consisting of State Farm, T.L., and Wilber, formed and maintained for the common purpose of operating an extra-judicial debt-recovery system to collect money from purported creditors through two separate patterns of racketeering activities.

233. Although not a legal entity, the business agreements between State Farm and T.L. and State Farm and Wilber are such that the entities are associated in fact for the express purpose of collecting alleged debts from Louisiana drivers.

234. The structure of the enterprise consists of State Farm, the principal and primary beneficiary, directing the debt collection activities of T.L. and Wilber, the agents and collectors. State Farm provides the data; T.L. and Wilber execute the scheme via mailings and threats.

235. If a purported debtor agrees to pay a lump sum amount to State Farm or agrees to a monthly payment plan, T.L. and Wilber agree to not initiate a suspension of their driving privileges pursuant to La. R.S. § 32:871, *et seq*.

236. The RICO Defendants are distinct from the enterprise. State Farm, T.L., and Wilber are individual corporations, while the enterprise is the association-in-fact formed by their ongoing contractual and data-sharing relationships.

237. T.L. and Wilber are independent third-party debt collectors, which have their own profit motives distinct from State Farm.

238. The shared purpose of State Farm and T.L. Thompson and State Farm and Wilber's enterprise is to enrich themselves through their extortionist and fraudulent scheme of demanding payments from purported nonjudgment debtors or else face a suspension of their driving privileges.

239. This common purpose is separate from the ordinary business of merely pursuing subrogation claims through normal litigation. Rather, it is an extortionist scheme designed to bypass the judicial process and coerce settlement without an adjudication of fault.

240. State Farm and T.L. and State Farm and Wilber have been associated with each other respectively in this manner for several years.

241. Indeed, the enterprise has operated this scheme continuously since at least 2020, constituting a "substantial period of time" sufficient for closed-ended continuity.

242. The RICO Defendants' devotion to making money from this repeated scheme to defraud and extort members of the Class demonstrates the enterprise's common purpose of engaging in this reprehensible course of conduct.

243. The RICO Defendants' respective association-in-fact relates to subrogation lawsuits and debt collection. This association-in-fact has existed for years and continues to exist this day in order to pursue their shared purpose in extorting purported debtors. Because this

scheme is the primary revenue engine for the RICO Defendants' subrogation departments, there is a specific and distinct threat that the racketeering activity will continue indefinitely.

244. This enterprise is a distinct entity from the RICO Defendants themselves, providing the structure and mechanism necessary to effectuate the illegal scheme outside the scope of merely providing legal or subrogation services to State Farm.

**The Pattern of Racketeering Activity**

245. The RICO Defendants conducted the enterprise's affairs through a pattern of racketeering activity, consisting of at least two predicate acts: (1) extortion by threat of unlawful injury to property (the driver's license) and (2) mail fraud by deliberate omission of a material fact in a communication to a government agency.

**Predicate Act 1: Extortion**

246. The RICO Defendants' first racketeering activity consists of the extortion of money from purported debtors through the wrongful threat of driver's license suspension, where the RICO Defendants knew they lacked a lawful basis to obtain such suspension absent a judicial or administrative determination of fault or liability.

247. "Extortion" chargeable under State law is one of the enumerated acts which constitutes a "racketeering activity" for RICO purposes. 18 U.S.C. § 1961(1).

248. Under Louisiana law, "[e]xtortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description." La. R.S. 14:66. The kinds of threats sufficient to constitute extortion include: a threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him; a threat to accuse the individual being threatened or any member of his family or any other person

held dear to him of any crime; a threat to cause harm as retribution for participation in any legislative hearing or proceeding, administrative proceeding, or in any other legal action; and a threat to do any other harm. *Id*.

249. The RICO Defendants threatened Plaintiffs with suspension of their driving privileges unless Plaintiffs paid disputed private claims, while knowingly misrepresenting that such suspension was a lawful and automatic consequence of nonpayment, and despite knowing they lacked lawful authority to obtain suspension under the Safety Responsibility Law.

250. In some cases, Plaintiffs received a "warning letter" addressed to each Plaintiff that threatened to have their driving privileges suspended if they did not call T.L. or Wilber regarding their "unpaid claim" for the purpose of extorting money from Plaintiff.

251. The RICO Defendants falsely represented that payment of the disputed private claim was a statutory condition for maintaining driving privileges, when in fact the Safety Responsibility Law requires only the posting of security with the State and does not authorize suspension to enforce unadjudicated private debts.

252. Unlike a lawful threat to institute civil litigation, the RICO Defendants employed the wrongful threat of administrative license suspension—an outcome they were not legally entitled to obtain—to extract payments they could not lawfully secure through judicial process.

253. The RICO Defendants acted with knowledge that the threatened administrative consequences exceeded the scope of lawful creditor remedies and were intended to coerce payment through fear of unlawful injury to Plaintiffs' property interests.

254. When Plaintiffs could not afford to pay, T.L or Wilber initiated the improper and illegal suspension of Plaintiff's driving privileges pursuant to La. R.S. 32:871 by mailing suspension notices to the State despite knowing such act was baseless.

255. Despite full knowledge that there was no valid basis for these requests, T.L. and Wilber repeatedly submitted suspension requests to the State.

256. Plaintiffs were damaged in their respective property in that their respective driver's licenses and driving privileges were suspended by the State as a direct result of T.L. and Wilber's actions and representations.

257. These predicate acts constitute extortion pursuant to La. R.S. § 14:66 and therefore meet the definition of a "racketeering activity" pursuant to 18 U.S.C. §1961(1)(A).

**Predicate Act 2: Mail Fraud**

258. The RICO Defendants' second predicate act in violation of RICO is "mail fraud" pursuant to 18 U.S.C. §1341. Mail fraud occurs whenever a person, having devised or intending to devise any scheme or artifice to defraud, uses the mail for the purpose of executing such scheme or artifice or attempting to do so. 18 U.S.C. § 1341.

259. The RICO Defendants executed a scheme to defraud and coerce money from Plaintiffs by submitting written correspondence through the United States Mail that deliberately omitted material facts the RICO Defendants were required to disclose.

260. The RICO Defendants had a duty to disclose these material facts because they voluntarily invoked a statutory administrative process that depends on accurate and complete information and because their submissions were intended to induce official action by the State.

261. Specifically, in their letters to Plaintiffs, the RICO Defendants purposely omitted the material fact that Plaintiffs had the right to a hearing—including the right to contest fault and damages—before their driver's licenses could be suspended, a fact material to Plaintiffs' ability to protect their property interests.

262. In the suspension requests mailed to the State, the RICO Defendants purposely omitted the material facts that Plaintiffs were not at fault or were only partially at fault, and that no judicial or administrative determination of liability had been made—while nevertheless seeking suspension for the full amount of alleged damages in contravention of Louisiana's comparative fault principles. *See* La. C.C. art. 2323 (2025).

263. Likewise, the RICO Defendants purposely omitted the material fact that the suspension requests were submitted solely to compel payment of disputed private claims.

264. Had any of this omitted information been provided, the suspension requests would not have resulted in the automatic suspension of Plaintiffs' driving privileges.

265. Representative acts of mail fraud include:

A. For Plaintiff Ariel Lee: By letter dated October 23, 2024, sent via USPS (mail) to the State, T.L. knowingly and intentionally omitted the lack of a judicial fault finding/judgment and the fact that the request was for commercial debt collection, and the fraudulent omission resulted in the subsequent suspension of Ms. Lee's driver's license.

B. For Plaintiff Eric Mayshack: By letter dated on or about March/April 2025, mailed via USPS (mail) to the State, Wilber knowingly and intentionally omitted the lack of a judicial fault finding/judgment and the fact that the request was for commercial

debt collection, and the fraudulent omission resulted in the suspension of Mr. Mayshack's driver's license.

C. For Plaintiff Erica Mayshack: By letter dated on or about March/April 2025, sent via USPS (mail) to the State, Wilber knowingly and intentionally omitted the lack of a judicial fault finding/judgment and the fact that the request was for commercial debt collection, and the fraudulent omission resulted in the suspension of Ms. Mayshack's driver's license.

266. As a direct and proximate result of the false representations and material omissions, the State suspended Plaintiffs' driving privileges, and Plaintiffs suffered economic injury, including reinstatement costs, transportation expenses, and lost employment opportunities.

267. The RICO Defendants acted knowingly and with specific intent to deceive Plaintiffs into believing that suspension of their driving privileges was a lawful and automatic consequence of nonpayment, thereby coercing Plaintiffs to pay disputed private claims under threat of wrongful license suspension.

268. The RICO Defendants made these fraudulent suspension requests because the threat or imposition of license suspension predictably increases the likelihood and amount of payments by purported debtors, who face severe personal and economic consequences if their driving privileges are revoked.

269. Absent knowledge of Louisiana law and the procedural protections afforded under the Safety Responsibility Law, purported debtors reasonably believe that suspension of their driver's licenses is inevitable unless and until they agree to pay the sums demanded by the RICO Defendants.

270. This scheme would not be possible but for the deliberate omission of material information from the suspension requests made by the RICO Defendants to the State.

271. The use of the mail was integral to the scheme, including suspension requests mailed to the State and to Plaintiffs.

272. The RICO Defendants' series of predicate acts extended over a substantial period of time and the threat of continuity exists for both Plaintiffs and the Class.

273. The three specific instances detailed in this Complaint (Ariel Lee, Eric Mayshack, Erica Mayshack) are evidence of a long-standing policy and practice and there are likely numerous other instances that will be uncovered in discovery, establishing open-ended continuity.

274. T.L. and Wilber are debt collectors acting on behalf of State Farm and these tactics have been used for years.

275. The RICO Defendants' blatant disregard for the law and extortionist scheme provides a substantial part of the RICO Defendants' enterprise and regular way of doing business. Their illegal acts will continue to be repeated in the future if not stopped by order of this Court.

**Effects on Interstate Commerce**

276. The enterprise affects interstate commerce by utilizing the United States Mail, transmitting data across state lines (between Illinois, Texas, and Louisiana), and processing payments through interstate banking channels.

**Benefits to the Enterprise**

277. The enterprise benefits from this pattern by effectively bypassing the cost of litigation to collect debts, thereby increasing the profit margins for State Farm and the collection fees for T.L. and Wilber.

278. The enterprise further benefits by extracting payments that it would not be legally entitled to recover, or would be entitled to recover only in reduced amounts, because in many instances the insured driver was wholly or partially at fault for the underlying accident and no adjudication of liability or comparative fault had occurred.

**Injury to Business or Property**

279. The RICO Defendants' predicate acts of mail fraud and extortion, including the initiation of fraudulent suspension requests, were the direct and proximate cause of Plaintiffs' and the Class's driver's licenses being suspended by the State without legal justification.

280. Even when the suspension was temporary, Plaintiffs and the Class suffered concrete economic injury, including loss of the lawful use of their driver's licenses, which impaired their ability to work, travel, and conduct ordinary commercial and personal affairs.

281. A driver's license constitutes a protected property interest, and its suspension represents a concrete deprivation of property for purposes of civil RICO.

**The Victims and Damages**

282. The suspension of Plaintiffs' and the Class's driving privileges caused concrete injury to their property and business interests, including:

A. Loss of their driver's licenses and driving privileges; and

B. Costs associated with the loss of their driver's licenses, including but not limited to, the cost to reinstate their driving privileges, the loss of employment, costs of

transportation, employment opportunities, and costs associated with criminal charges, if any, as a result of driving on a suspended license.

283. These injuries constitute direct injuries to the Plaintiffs' and the Class's property (driver's license) and business interests (loss of employment, transportation costs), which flow directly from the RICO Defendants' predicate acts of mail fraud and extortion. The suspension of driving privileges was the intended and foreseeable result of the RICO Defendants' fraudulent and coercive conduct, rendering the RICO Defendants the direct cause of Plaintiffs' damages.

284. By reason of the damages to their property and business sustained as a result of the RICO Defendants' RICO violations, Plaintiffs and the Class are entitled to recover actual damages, treble damages, costs, and attorneys' fees.

285. Plaintiffs and the Class also seek declaratory relief, nominal damages where appropriate, and an order enjoining the RICO Defendants from continuing the unlawful conduct alleged herein.

**COUNT VII: Fraud Under Louisiana Law**
***Class Action Claim Against State Farm, T.L., and Wilber***

286. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

287. Louisiana Civil Code article 1953 provides that fraud is a misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.

288. State Farm, T.L., and Wilber knowingly made false representations and material omissions of fact to Plaintiffs, with the intent to obtain an unjust advantage and to cause

loss or inconvenience, including but not limited to false and misleading representations that:

(a) Plaintiffs were legally obligated to pay the amounts demanded despite the absence of any adjudication of fault or liability;

(b) Plaintiffs' driver's licenses could lawfully and automatically be suspended solely for nonpayment of disputed private claims; and

(c) State Farm, T.L., and Wilber possessed lawful authority to initiate or cause license suspension as a debt-collection scheme.

289. Plaintiffs reasonably relied on State Farm, T.L., and Wilber's misrepresentations and material omissions, including their failure to disclose Plaintiffs' right to contest fault and liability before any suspension could lawfully occur, and were thereby induced to make payments they did not owe and to forgo contesting liability or pursuing available legal remedies.

290. As a direct and proximate result of State Farm, T.L., and Wilber's fraudulent conduct, Plaintiffs suffered damages, including coerced payments, reinstatement fees, lost wages, transportation expenses, and other out-of-pocket losses.

291. At all relevant times, T.L. and Wilber acted on behalf of, and as co-conspirators with, State Farm and within the course and scope of that agency. State Farm authorized, directed, and/or knowingly ratified the fraudulent conduct described herein and accepted the financial benefits derived therefrom.

292. State Farm, T.L., and Wilber's fraud caused Plaintiffs economic loss and significant inconvenience within the meaning of La. C.C. art. 1953.

293. State Farm, T.L., and Wilber's fraudulent misrepresentations and omissions were made through written correspondence sent by mail to Plaintiffs on specific dates and in connection with specific claims, as described herein, and are pleaded with particularity sufficient to satisfy Federal Rule of Civil Procedure 9(b).

294. State Farm, T.L., and Wilber's fraudulent scheme was uniform in design and execution, and Plaintiffs and the Class were exposed to materially identical misrepresentations and omissions, rendering reliance and causation susceptible to common proof.

295. As a direct and proximate result of State Farm, T.L., and Wilber's fraudulent misrepresentations and material omissions, Plaintiffs and the Class suffered ascertainable economic losses, including coerced payments, loss of driving privileges, reinstatement costs, lost wages, transportation expenses, and other out-of-pocket damages.

**COUNT VIII: Unjust Enrichment Under Louisiana Law**
***Class Action Claim Against State Farm, T.L., and Wilber***

296. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

297. This claim is asserted expressly in the alternative and only to the extent Plaintiffs are found to lack an adequate remedy at law.

298. To the extent this Court determines that State Farm, T.L., and Wilber's conduct does not give rise to liability under Plaintiffs' other causes of action, State Farm, T.L., and Wilber have nevertheless been unjustly enriched at Plaintiffs' and the Class's expense within the meaning of Louisiana Civil Code article 2298.

299. As a result of State Farm, T.L., and Wilber's unlawful practices, Plaintiffs, or a subclass of Plaintiffs, paid money to T.L. and Wilber, acting on behalf of State Farm.

300. These payments were made in connection with disputed accident claims that were never subjected to any administrative investigation or determination of liability, much less adjudication of fault.

301. Plaintiffs made such payments under the threat of suspension of their driver's licenses and the severe personal and economic hardships attendant to the loss of lawful driving privileges.

302. T.L. and Wilber, and in turn State Farm, were enriched by the receipt and retention of these payments, while Plaintiffs were correspondingly impoverished by the loss of money paid under coercive circumstances.

303. State Farm, T.L., and Wilber knew or should have known that retaining these payments under such circumstances was inequitable and lacked lawful justification or cause.

304. Under Louisiana law, the cause of an obligation is unlawful when its enforcement would produce a result prohibited by law or contrary to public policy. La. C.C. art. 1968.

305. Because State Farm, T.L., and Wilber's enrichment was based on leveraging the threat of driver's license suspension to unlawfully extract payment of disputed private claims, enforcement of such obligations produces a result the Legislature did not authorize and therefore cannot supply a lawful cause.

306. Plaintiffs were harmed by State Farm, T.L., and Wilber's unjust receipt of benefits from Plaintiffs.

307. Plaintiffs received no corresponding benefit or lawful consideration in exchange for the sums paid to State Farm, T.L., and Wilber.

308. To the extent Plaintiffs are found to lack another remedy at law for the recovery of these sums, equity requires restitution of all amounts wrongfully collected and improperly retained by State Farm, T.L., and Wilber.

309. Plaintiffs seek restitutionary relief to restore the parties to the positions they occupied prior to Defendants' unjust enrichment. Plaintiffs and the Class are therefore entitled to recover from State Farm, T.L., and Wilber the full amount of their unjust enrichment, together with legal interest and all equitable relief available under Louisiana law.

## JURY TRIAL DEMAND

310. Plaintiffs demand a jury trial for all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray for judgment as follows:

A. An Order certifying this action as a class action under Federal Rule of Civil Procedure 23, certifying the proposed Class and any appropriate Subclasses, appointing Plaintiffs as Class Representatives, appointing undersigned counsel as Class Counsel, approving appropriate notice, granting such other class-related relief as the Court deems proper, and requiring Defendants to bear the costs of a class action;

B. A declaration that the policies, practices, customs, and procedures implemented and enforced by Gary Westcott, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and Keith E. Neal, in his official capacity as Commissioner of the Louisiana Officer of Motor Vehicles, violate the Due Process Clauses of the United States and Louisiana Constitutions,

including actionable violations under 42 U.S.C. § 1983, justifying prospective declaratory and injunctive relief;

C. An Order enjoining Gary Westcott, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and Keith E. Neal, in his official capacity as Commissioner of the Louisiana Officer of Motor Vehicles, from suspending, maintaining, or enforcing suspensions of driver's licenses under the Safety Responsibility Law absent constitutionally adequate notice and a meaningful opportunity to be heard—including procedures that provide an adequate mechanism to contest fault, liability, and the amount of security—consistent with federal and Louisiana constitutional requirements;

D. A declaration that the conduct of State Farm Mutual Automobile Insurance Company, T.L. Thompson & Associates, Inc., and Wilber and Associates, P.C. d/b/a Wilber Group: (1) violates the Due Process Clauses of the United States and Louisiana Constitutions, including but not limited to actionable violations under 42 U.S.C. § 1983, justifying declaratory and injunctive relief and damages; (2) constitutes an abuse of rights under Louisiana law; (3) violates the Federal RICO Act; (4) constitutes fraud under Louisiana law; and (5) constitutes conduct that has unjustly enriched State Farm, T.L., and Wilber and impoverished Plaintiffs and the Class;

E. An Order enjoining State Farm, T.L., and Wilber from (i) threatening to cause, or causing, driver's license suspensions to collect disputed private claims absent a lawful adjudication of liability, and (ii) sending or causing to be sent communications that misrepresent the legal basis for suspension, the recipient's

rights, or the nature of the alleged obligation, and requiring corrective disclosures as appropriate;

F. An Order directing Gary Westcott, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and Keith E. Neal, in his official capacity as Commissioner of the Louisiana Officer of Motor Vehicles, to reinstate driver's licenses suspended as a result of the unlawful conduct alleged herein and to take any other remedial steps necessary to restore affected Class members to the status quo ante pending constitutionally compliant procedures;

G. A judgment awarding Plaintiffs and the Class compensatory, economic, monetary, actual, consequential damages, statutory, treble, punitive and all other damages available under federal and Louisiana law, in amounts to be determined at a trial by jury, against State Farm Mutual Automobile Insurance Company, T.L. Thompson & Associates, Inc., and Wilber and Associates, P.C. d/b/a Wilber Group, as permitted by law;

H. A judgment awarding Plaintiffs and the Class restitution and/or disgorgement of all funds by which State Farm Mutual Automobile Insurance Company, T.L. Thompson & Associates, Inc., and Wilber and Associates, P.C. d/b/a Wilber Group have been unjustly enriched as a result of Defendants' unlawful and unconstitutional conduct;

I. A judgment awarding Plaintiffs and the Class costs and fees, including attorney's fees, as permitted by law;

J. A judgment awarding Plaintiffs and the Class pre-judgment and post-judgment interest as permitted by law.

K. Such other relief that the Court may deem just and proper.

Respectfully Submitted,

_*/s/ Charles E. Tabor*_________
**CHARLES E. TABOR**
**ATTORNEY AT LAW, LLC**
Charles E. Tabor (#31984)
Thomas G. Hathaway (#40810)
Marshall O. Johnston (#38026)
2106 Fairfield Avenue
Shreveport, Louisiana 71104
Phone: 318-963-0953
Fax: 318-582-1245
service@charlestaborlaw.com

AND

**JOSEPH A. GREGORIO**
Joseph A. Gregorio (#22191)
1100 Benton Road
Bossier City, Louisiana 71111
Phone: 318-747-0384
Fax: 318-746-5222
joe@bossiercitylawyer.com

AND

**BRUNO & BRUNO, LLP**
Joseph M. Bruno (#3604)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504)-525-1335
Facsimile: (504)-561-6775
Email: jbruno@brunobrunolaw.com

**ATTORNEYS FOR PLAINTIFFS AND PROPOSED CLASS MEMBERS**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.

_*/s/ Charles E. Tabor*________